Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MONZER ERAKAT

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

MONZER ERAKAT, on behalf of himself and all similarly situated persons,

Plaintiff,

v.

THE INTERCEPT MEDIA, INC., a Delaware corporation,

Defendant.

Case No.: 2:26-cv-02508-TLN-CSK

**FIRST AMENDED CLASS ACTION COMPLAINT**

1) Cal. Penal Code § 631
2) 18 U.S.C. § 2511(1)(a)
3) Cal. Bus. & Prof. Code § 17200, *et seq.*
4) Cal. Constitution Art. I § 1
5) Intrusion Upon Seclusion
6) Unjust Enrichment

1. Plaintiff MONZER ERAKAT ("Plaintiff") files this first amended class action complaint on behalf of himself and all others similarly situated, against Defendant THE INTERCEPT MEDIA, INC., a Delaware corporation ("Defendant"), and alleges as follows:

## I. NATURE OF THE ACTION

2. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.theintercept.com (the "Website"), an online news publication that Defendant operates and provides for public access and use.

3. During his use of the Website, Plaintiff navigated to multiple pages addressing sensitive personal subject matter, including pages addressing the Israel-Palestine conflict, the conduct of the United States government in connection with that conflict, federal immigration enforcement, and federal law-enforcement conduct against political protesters, unaware that Defendant was causing and permitting third parties to intercept the contents of his communications and to associate those contents with persistent, cross-session user identifiers.

4. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was reading, the page titles identifying in plain English the subject matter of those pages, the referrer URLs reflecting prior navigation paths, and persistent identifiers tying those communications to Plaintiff across browsing sessions.

5. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs and page titles reflecting in human-readable terms what users are reading on the Website, and transmits those contents to multiple distinct third-party entities for those third parties' independent commercial use.

6. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act,

18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously through to today and is, on information and belief, continuing to do so. Defendant's conduct also gives rise to additional state-law claims under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; the right to privacy under Article I, Section 1 of the California Constitution; the common law tort of intrusion upon seclusion; and the doctrine of unjust enrichment.

7. Plaintiff personally used the Website during the class period and preserved an HTTP archive file (commonly known as a HAR file) of his own browsing session. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received. Plaintiff's HAR file accordingly records the requests his browser transmitted to the Third Parties during that session, including the named parameters carrying the contents of his communications with the Website and the persistent identifiers transmitted with them. Counsel also caused an independent technical investigation to be conducted that replicated the URLs and user flows presented in Plaintiff's HAR file, using the investigator's own browsing sessions, and that documented the same third-party tracking transmissions described in this Complaint. The figures and screenshots reproduced below are from that independent investigation and are included as corroboration of the mechanisms that Plaintiff's HAR file records.

## II. <u>GENERAL ALLEGATIONS</u>

8. A web tracker is a tracking mechanism embedded in a website that monitors user interactions and transmits data to third-party servers. Web trackers may take the form of a transparent 1x1 image, a JavaScript snippet, or an analytics pixel that activates automatically when a webpage is loaded or when a user performs a tracked action.

9. When triggered, trackers cause the user's browser to transmit data to third-party servers, including the contents of the user's communications with the host website such as page URLs identifying what the user is reading, page titles identifying the subject

matter of those pages, and referrer URLs reflecting prior navigation. The trackers also transmit persistent user identifiers that tie those communications to a specific user across browsing sessions.

10. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers, including the following (collectively, the "Trackers"):

- The Parse.ly Tracker
- The Google Analytics Tracker

11. The Trackers are operated by distinct third parties: Parse.ly (as to the Parse.ly Tracker at p1.parsely.com and api.parsely.com) and Google (as to the Google Analytics Tracker at www.google-analytics.com). Each operates independently of Defendant and of the other Tracker and pursues its own commercial purposes for the data it receives.

12. The third parties who operate the above-listed Trackers use the contents of users' communications collected via the Website for their own independent commercial purposes. Parse.ly uses them for content analytics, audience analysis, and the construction of per-visitor reading histories and profiles that serve its own recommendation products. Google uses information it receives from sites that deploy its services for Google's own purposes, including improving its services, measuring advertising, and personalizing content and ads. Those purposes extend beyond Defendant's own operational needs and reflect the business models of each independent third-party operator.

13. Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers each time a user loads a page of the Website, without any user interaction or affirmative action by the user. The interception of users' communications by the Trackers is the direct, intended, and foreseeable consequence of Defendant's deliberate configuration of the Website.

14. When Plaintiff directed his browser to a page of the Website, his browser transmitted a request for that page to Defendant's servers and began loading the page.

As part of that same page load, and without any further request or action by Plaintiff, the browser executed the Trackers' code, which Defendant had embedded in the page. Two sets of code therefore ran as part of the browser's single attempt to load each page: Defendant's code, which delivered the page Plaintiff requested, and the Trackers' code, which delivered nothing to Plaintiff and instead caused his browser to transmit the contents of his communications to third parties. The Trackers' transmissions were initiated by the Trackers' code and were concurrent with Plaintiff's communications with the Website.

15. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records, and there was no separate, later transaction by which those contents were provided to them. The Trackers' code read the page URL, the page title, and the referring URL directly from the browser's state for the page then being loaded, values that identified that page and no other, wrote those values into named parameters of new requests, and directed Plaintiff's browser to send those requests to the third parties' servers.

16. The operators of the Trackers design them to operate this way automatically. Parse.ly's technical documentation states that, by default, its tracking code reports an event immediately upon the tracking script finishing loading in the page. (Parse.ly, Dynamic Tracking: Setup and configuration, https://docs.parse.ly/installation-resources/parsely-integration/tracking-code-setup/dynamic-tracking/.)

17. Google's technical documentation for Google Analytics 4 likewise states that whenever someone loads a page of a website on which the tag is installed, a page_view event is sent to Google Analytics automatically, by default, unless the website operator affirmatively disables that behavior. (Google for Developers, Measure pageviews, https://developers.google.com/analytics/devguides/collection/ga4/views.)

18. During the page-load process, the Parse.ly Tracker dispatches outbound GET requests to p1.parsely.com and outbound requests to api.parsely.com, and the Google Analytics Tracker dispatches outbound POST requests to www.google-

analytics.com. Each of those tracker requests fires automatically, without any user interaction or affirmative action, and is dispatched during the page-load process before the page-load process completes, carrying the contents of the user's communications with the Website to the third-party operators of the Trackers.

19. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices, did not consent to the contents of their communications with the Website being transmitted to the third parties operating the Trackers, and did not consent to the use or commercial exploitation of those contents by Defendant or by the third parties.

20. Generalized references herein to users, visitors, and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

21. Plaintiff MONZER ERAKAT is a California citizen residing in Solano County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on June 3, 2026. The allegations set forth herein concerning the conduct of Defendant pertain to and are based on Plaintiff's use of the Website in California.

22. Defendant THE INTERCEPT MEDIA, INC. is a Delaware corporation with its principal place of business in New York. The Intercept Media, Inc. owns, operates, and controls the Website and is responsible for the configuration, embedding, and deployment of the tracking technologies described herein.

## IV. JURISDICTION AND VENUE

23. Defendant is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10. Defendant has purposefully availed itself of the benefits and protections of California law by, among other things, operating an editorial and commercial website accessible to and targeted at California residents; entering into and benefiting from commercial relationships with third-party tracking, advertising, and analytics vendors

whose services depend on the collection of California residents' browsing data; and intentionally embedding tracking technologies that cause the interception of California residents' electronic communications while those communications occur in California.

24. Defendant's purposeful availment of California also extends to its commercial partnership with a California-headquartered third-party tracking vendor. The Google Analytics Tracker deployed on the Website is operated by Google, a California-headquartered company with its principal place of business in Mountain View, California. By embedding the Google Analytics Tracker on the Website and configuring the Website to transmit California residents' browsing communications to that California-headquartered third party, Defendant purposefully directed its tracking infrastructure into California, established and maintained ongoing commercial relationships with a California-based business, and caused the intercepted communications of California residents to be transmitted to, and used for the commercial benefit of, that California-headquartered business.

25. Defendant's tracking arrangement operates on the devices of Website visitors, including visitors in California. The Trackers' code executes in the visitor's browser, on the visitor's device, and causes that device to transmit the contents of the visitor's communications from California. By embedding and configuring that code, Defendant caused tracking software to run on the devices of California residents, in California, including on Plaintiff's device while Plaintiff was in California, and obtained the analytics and audience-development benefits of that tracking from the communications of California visitors. Defendant's editorial coverage likewise cultivates and appeals to a California audience: Defendant maintains extensive California-focused reporting, including coverage of California elections and California state officials, and as of August 2026 a search of the Website for the term California returns approximately 2,100 articles.

26. Plaintiff's claims arise out of and relate to Defendant's forum-related conduct. Plaintiff's communications were intercepted while Plaintiff was physically

located in California; the interception occurred through tracking infrastructure Defendant purposefully deployed and operated; and the harm Plaintiff suffered occurred in California.

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under the laws of the United States, namely the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a).

28. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy.

29. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because at least one Class Member is a citizen of a State different from Defendant, the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and there are at least 100 Class Members.

30. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District, a substantial part of the events giving rise to the claims occurred in this District, and Defendant regularly transacts business in this District.

## V. FEDERAL AND STATE PRIVACY LAWS

31. The California Invasion of Privacy Act ("CIPA") is a legislative measure designed to safeguard the privacy rights of California residents in the face of advancing technology. Enacted in 1967 and codified at Cal. Penal Code §§ 630–638, CIPA established a comprehensive framework to protect the privacy of personal communications.

32. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the Legislature's intent. CIPA's reach extends to electronic communications transmitted over the Internet because the statutory definitions are technology-neutral and the Legislature has

repeatedly affirmed CIPA's adaptability to new modes of communication.

33. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties."

34. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory damages per violation, or three times the amount of actual damages, whichever is greater, pursuant to Cal. Penal Code § 637.2(a)(1).

35. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits any person from intentionally intercepting any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

36. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the Wiretap Act's protections to electronic communications, defined to include any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. 18 U.S.C. § 2510(12).

37. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520 and is entitled to recover the greater of actual damages or statutory damages, punitive damages where appropriate, and reasonable attorney's fees and litigation costs.

## VI. SPECIFIC ALLEGATIONS

38. During his use of the Website on June 3, 2026, and as reflected in his HAR file, Plaintiff completed twelve page loads on the Website, navigating to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- the Website's homepage, at theintercept.com;
- the collection titled "Israel's War on Gaza" at theintercept.com/collections/israel-palestine/, together with pages 2 through 5 of that collection, each bearing the same title;
- the article "New Midterm Ads Seize on Republican Rift Over Israel Amid Iran War" at theintercept.com/2026/03/04/iran-israel-us-war-republican-democrat-midterms/;
- the article "How Could Dems Hold the Biden Admin Accountable for Gaza?" at theintercept.com/2026/02/25/democrats-gaza-genocide-accountability/;
- the article "Keep Talking About Gaza at Your Thanksgiving Table" at theintercept.com/2025/11/27/gaza-thanksgiving-family/;
- the article "If Zohran Mamdani Can't Win on Palestine, Who Can?" at theintercept.com/2025/10/16/zohran-mamdani-palestine-israel-nyc-mayor-debate/;
- the series page titled "Unmasking ICE" at theintercept.com/series/unmasking-ice/; and
- the article "He Witnessed an Earlier Shooting. Feds Arrested Him at the Scene of Alex Pretti's Killing." at theintercept.com/2026/01/31/minneapolis-protester-witness-killing-alex-pretti/.

39. Plaintiff's HAR file records that, during each of those page loads, Plaintiff's browser transmitted the contents of his communications with the Website, including the page URLs he requested, the page titles of those pages, and, for each page after the first, the referring URL reflecting his navigation path, together with persistent identifiers tied to Plaintiff, to each of the Trackers, in the requests and named parameters described below. The independent technical investigation that counsel commissioned replicated the URLs and user flows recorded in Plaintiff's HAR file and observed the same tracking

mechanisms operating in the same manner, and its captures are reproduced below as corroboration.

***1. The Parse.ly Tracker***

40. Defendant embedded and deployed a Parse.ly tracking mechanism on the Website, operated by Parse.ly through its content-analytics platform. The Parse.ly code that ran in Plaintiff's browser was a build of Parse.ly's tracking script published for Defendant's Parse.ly account, which Plaintiff's browser downloaded from cdn.parsely.com/keys/theintercept.com/p.js, and every request the Parse.ly mechanism sent carried Defendant's Parse.ly account identifier in a named parameter: idsite=theintercept.com on requests to p1.parsely.com, and apikey=theintercept.com on requests to api.parsely.com. The Parse.ly mechanism was not a resource Plaintiff requested, delivered nothing visible to Plaintiff, and was not necessary to display the Website's pages.

41. The Parse.ly mechanism operated as follows. Plaintiff's browser transmitted his request for a page to Defendant's servers and began loading that page. As part of that same page load, and without any further request or action by Plaintiff, the browser executed the Parse.ly code. That code obtained the full page URL, the page title, and the referring URL from the browser's state for the page then being loaded, read the persistent Parse.ly visitor identifier described below from the browser's storage, wrote those values into named parameters of a new request (url, title, urlref, and u, respectively), and directed Plaintiff's browser to send that request, classified by the browser as a request for an image from a different site, to Parse.ly's servers at p1.parsely.com. The transmission to Parse.ly was a second and concurrent transmission, initiated by Parse.ly's code, duplicating the contents of Plaintiff's communication with the Website at the time Plaintiff selected each page, and it was concurrent with the communications between Plaintiff's browser and the Website.

42. On every page Plaintiff loaded, the Parse.ly code also directed Plaintiff's browser to send a request to Parse.ly's profile interface at api.parsely.com/v2/profile.

Each such request carried, in named parameters, Defendant's Parse.ly account identifier (apikey=theintercept.com), Plaintiff's persistent Parse.ly visitor identifier (in the uuid parameter), and the full URL of the page Plaintiff was then reading (in the url parameter). Plaintiff's HAR file records such a request for every page he visited.

43. Plaintiff's HAR file records the Parse.ly transmissions on every page Plaintiff loaded. Among the values transmitted to Parse.ly in single requests, in plain, human-readable English, were: url=https://theintercept.com/2026/02/25/democrats-gaza-genocide-accountability/ with title=How Could Dems Hold the Biden Admin Accountable for Gaza?; url=https://theintercept.com/2025/10/16/zohran-mamdani-palestine-israel-nyc-mayor-debate/ with title=If Zohran Mamdani Can't Win on Palestine, Who Can?; url=https://theintercept.com/2026/01/31/minneapolis-protester-witness-killing-alex-pretti/ with title=He Witnessed an Earlier Shooting. Feds Arrested Him at the Scene of Alex Pretti's Killing.; and url=https://theintercept.com/collections/israel-palestine/ with title=Israel's War on Gaza. Each of those requests also carried, in the urlref parameter, the address of the Website page from which Plaintiff had navigated, and, in the u parameter, Plaintiff's persistent Parse.ly visitor identifier, which was identical in every Parse.ly request recorded across Plaintiff's entire session.

44. Every request Plaintiff's browser sent to p1.parsely.com, pageview and heartbeat alike, also carried named session parameters showing that the Parse.ly mechanism had encountered Plaintiff before: a session-number parameter (sid) with the value 3, identifying the recorded session as the third session under Plaintiff's visitor identifier, and a last-session-timestamp parameter (slts) carrying a value corresponding to a prior session on the preceding day. The visitor identifier itself is assigned by Parse.ly's code, in Parse.ly's own namespace, and is stored in the browser so that it persists across sessions, including in the _parsely_visitor cookie and in the Website's own _ti_user_properties_data cookie. Plaintiff's HAR file shows the Website's own _ti_user_properties_data cookie holding Plaintiff's Parse.ly visitor identifier at the start

of his session, before he loaded a single page.

45. The Parse.ly mechanism also continued transmitting as Plaintiff read. When Plaintiff remained on a page, the Parse.ly code sent additional requests to p1.parsely.com, denominated heartbeat events, each again carrying the URL of the page Plaintiff was then reading, the referring URL, and Plaintiff's persistent visitor identifier, together with the same session parameters. Plaintiff's HAR file records such requests sent while he remained on articles identified above.

46. Figure 1 is a Fiddler Classic raw request capture from the technical investigation showing an outbound request transmitted to Parse.ly at p1.parsely.com during the page load for the article "If Zohran Mamdani Can't Win on Palestine, Who Can?" The capture reflects the simultaneous transmission, in a single request, of the full page URL in the url parameter, the plain-English page title in the title parameter, Defendant's Parse.ly account identifier in the idsite parameter, and the Parse.ly persistent visitor identifier in the u parameter.

**Figure 1**




/ / /

47. Parse.ly captured the contents of Plaintiff's communications at the moment of each page load, for content-analytics and audience purposes, and attributed those contents to Plaintiff's persistent visitor identifier, which was transmitted in the same request. Parse.ly acted on the transmitted values on receipt. Parse.ly's own technical documentation states that the profile interface to which Plaintiff's browser transmitted his identifier and each page URL exists to record, for the individual associated with the transmitted identifier, that this individual has visited the transmitted page, so that Parse.ly can build a reading profile of that individual and generate personalized recommendations from it; that Parse.ly maintains a running history of the content each visitor has read; and that Parse.ly consults that history, and screens out items the visitor has already read, when choosing what to recommend. (Parse.ly, Content Recommendations, https://docs.parse.ly/api/api-endpoints/content-recommendations/.)

48. Performing those operations requires reading. To log each transmitted page URL to the correct individual's profile as it arrives, to categorize it as content that individual has read, and to attribute it to the persistent identifier transmitted alongside it, Parse.ly must contemporaneously parse, read, and learn the contents of the transmitted values. Parse.ly accordingly read, attempted to read, and learned the contents of Plaintiff's and Class Members' communications with the Website as those contents were acquired, concurrently with Plaintiff's and Class Members' communications with the Website and while those communications were in transit.

49. Parse.ly operates its content-analytics and recommendation business independently of Defendant and pursues its own commercial purposes. Parse.ly generates and assigns visitor identifiers in its own namespace using its own code, receives the transmitted contents on its own servers, and maintains the resulting visitor reading histories and profiles on its own systems, where they serve Parse.ly's own products. Parse.ly has the capability to use the contents of the communications it acquires for purposes of its own, beyond any purpose of Defendant's.

/ / /

50. Parse.ly is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that acquired those communications in transit between Plaintiff's browser and Defendant. That Parse.ly also provides analytics services to Defendant does not make it a party to those communications or a mere extension of Defendant: Parse.ly receives the contents on its own servers, under an identifier it assigns in its own namespace, with the capability to use them for its own purposes.

51. Nothing anonymizing accompanied any of these transmissions. No Parse.ly request recorded in Plaintiff's HAR file, and none observed in the technical investigation, carried any parameter restricting or limiting Parse.ly's collection or use of the transmitted contents, and the contents were transmitted in plain, human-readable form, not hashed, truncated, or redacted.

***2. The Google Analytics Tracker***

52. Defendant embedded and deployed a Google Analytics tracking mechanism on the Website, operated by Google through its Google Analytics 4 ("GA4") web-analytics platform. Defendant's own first-party code and Defendant's Google Tag Manager container cause the GA4 code to load and execute on every page of the Website, configured under Defendant's GA4 property identifier, G-94T13D50WM. The Google Analytics mechanism fires automatically during the page-load process and transmits data via POST requests to www.google-analytics.com, including, in named parameters of a single request, the full page URL of each page the user visits (in the dl parameter), the page title of each page, in plain English (in the dt parameter), the referring URL (in the dr parameter), a persistent Google Analytics client identifier (in the cid parameter), and Defendant's GA4 property identifier (in the tid parameter). The GA4 mechanism was not a resource Plaintiff requested, delivered nothing visible to Plaintiff, and was not necessary to display the Website's pages.

53. The GA4 mechanism operated as follows. Plaintiff's browser transmitted his request for a page to Defendant's servers and began loading that page. As part of that

same page load, and without any further request or action by Plaintiff, the browser executed the GA4 code. That code obtained the full page URL, the page title, and the referring URL from the browser's state for the page then being loaded, read the persistent client identifier from the browser's _ga cookie, wrote those values into the named parameters of a new request, and directed Plaintiff's browser to send that request to Google's servers at www.google-analytics.com. The transmission to Google was a second and concurrent transmission, initiated by Google's code, duplicating the contents of Plaintiff's communication with the Website at the time Plaintiff selected each page, and it was concurrent with the communications between Plaintiff's browser and the Website. Google's own specification for the tag states that the page-location and page-title values transmitted with each pageview default to the address and the title of the page as they exist in the browser's own state. (Google for Developers, Measure pageviews, https://developers.google.com/analytics/devguides/collection/ga4/views.)

54. Plaintiff's HAR file records the GA4 transmissions for every page Plaintiff loaded. Among the values transmitted to Google in single requests were: dl=https://theintercept.com/2026/02/25/democrats-gaza-genocide-accountability/ with dt=How Could Dems Hold the Biden Admin Accountable for Gaza?; dl=https://theintercept.com/2025/10/16/zohran-mamdani-palestine-israel-nyc-mayor-debate/ with dt=If Zohran Mamdani Can't Win on Palestine, Who Can?; and dl=https://theintercept.com/2026/01/31/minneapolis-protester-witness-killing-alex-pretti/ with dt=He Witnessed an Earlier Shooting. Feds Arrested Him at the Scene of Alex Pretti's Killing. Each of those requests carried, in the dr parameter, the address of the Website page from which Plaintiff had navigated to the page identified in the dl parameter, and every request Plaintiff's browser sent to www.google-analytics.com during his session carried Plaintiff's persistent client identifier, in the cid parameter, together with Defendant's property identifier, tid=G-94T13D50WM.

55. Every GA4 request Plaintiff's browser sent also carried a session-count parameter (sct) with the value 3, identifying the recorded session as the third session

under Plaintiff's client identifier. The client identifier is assigned by Google's code in Google's own namespace and stored in the browser in the _ga cookie, where it persists across sessions, and the portion of the transmitted value following the final period decodes to a time days before the recorded session, showing that the identifier had been assigned to Plaintiff's browser during an earlier visit and reused when he returned.

56. The GA4 mechanism likewise transmitted beyond the initial page view. Requests from Plaintiff's browser to www.google-analytics.com also carried additional Defendant-configured events, including events denominated view_article, transmitting parameters Defendant defined for its property such as an article's paywall status and its publication timestamp, and events denominated scroll, reporting the depth to which Plaintiff had scrolled the page he was reading. Plaintiff's HAR file records these events throughout his session, and every request carrying them was sent to www.google-analytics.com with Plaintiff's persistent client identifier.

57. Figure 2 is a Fiddler Classic raw request capture from the technical investigation showing an outbound POST request transmitted to Google at www.google-analytics.com. The capture reflects the simultaneous transmission, in a single request, of the page URL in the "dl" parameter, the plain-English page title in the "dt" parameter, the persistent Google Analytics client identifier in the "cid" parameter, and Defendant's GA4 property identifier in the "tid" parameter.

/ / /

/ / /

/ / /

**Figure 2**




58. Google captured the contents of Plaintiff's communications at the moment of each page load, for web-analytics and advertising purposes, and attributed those contents to the persistent client identifier transmitted in the same request. Google acts on the transmitted values on receipt: on receiving each transmission, Google parses it, attributes the transmitted page URL and page title to the transmitted client identifier and session, and incorporates the event into the reporting Google maintains for Defendant's GA4 property, including reporting that Google's own documentation describes as letting the operator watch activity on the website as it occurs. (Google Analytics Help, [GA4] Realtime report, https://support.google.com/analytics/answer/9271392.)

59. Performing those operations requires reading. To attribute each transmitted page URL and page title to the correct client identifier and session as the transmission arrives, and to categorize and count the event in the reporting for Defendant's property, Google must contemporaneously parse, read, and learn the contents of the transmitted values. Google accordingly read, attempted to read, and learned the contents of Plaintiff's and Class Members' communications with the Website as those contents were

acquired, concurrently with Plaintiff's and Class Members' communications with the Website and while those communications were in transit.

60. Google uses the information it receives from websites that deploy its services for Google's own purposes. Google's published policies state that when sites and apps integrate Google's services, they share information with Google, and that Google uses the information so shared to deliver, maintain, and improve Google's own services, to develop new services, to measure how well advertising performs, and to tailor the content and advertisements people see, both on Google's own properties and on the sites and applications of Google's partners. The same policy states that when a person visits a website that uses Google services, including analytics tools such as Google Analytics, the person's browser automatically sends certain information to Google, including the address of the page the person is visiting. (Google, How Google uses information from sites or apps that use our services, https://policies.google.com/technologies/partner-sites.)

61. Google is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that acquired those communications in transit between Plaintiff's browser and Defendant. That Google also provides analytics services to Defendant does not make it a party to those communications or a mere extension of Defendant: Google receives the contents on its own servers, under a client identifier assigned in Google's own namespace, with the capability to use them for its own purposes.

***3. Persistent Identifiers Stored in the Browser***

62. Figure 3 is a Chrome DevTools Application panel capture from the technical investigation showing the browser's cookie storage during the load of the Website. The capture shows the persistent identifier cookies described above stored in the browser: _ga and _ga_94T13D50WM, associated with the Google Analytics Tracker, each with an expiration date in 2027, more than a year after the capture, and _parsely_visitor and the Website's own _ti_user_properties_data cookie, each holding

the same Parse.ly visitor identifier as the other and each with an expiration date in 2027. These identifiers enable each Tracker's operator to re-identify the same user on subsequent visits to the Website, and the transmissions recorded in Plaintiff's HAR file show that they did so as to Plaintiff: as alleged above, the session parameters transmitted from his browser identified his June 3, 2026 session as the third session under each Tracker's persistent identifier and, as to Parse.ly, carried the time of a prior session.

**Figure 3**




### *4. Interception While In Transit*

63. As alleged above, two sets of code ran as part of Plaintiff's browser's single attempt to load each page of the Website: Defendant's code, which delivered the page Plaintiff requested, and the Trackers' code, which delivered nothing to Plaintiff and instead caused his browser to duplicate the contents of his communications to the Third Parties.

64. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records, and no separate, later transaction supplied those contents to them. The Trackers' code read the page URL, the page title, and the referring

URL from the browser's state for the page then being loaded, values that identified that page and no other, together with the persistent identifiers stored in the browser, and transmitted them as part of the same page load, at the time Plaintiff selected each page.

65. The transmissions to the Trackers were accordingly initiated by the Trackers' code and were concurrent with Plaintiff's communications with the Website, and the contents of Plaintiff's communications were acquired by the Trackers while those communications were in transit.

66. No action by Plaintiff was required to cause any of these transmissions, and none of them was visible to him. Plaintiff did not know that the Trackers were executing in his browser or that the contents of his communications were being duplicated and transmitted to the Third Parties as he read.

67. Defendant knew of, configured, and participated in this arrangement. Defendant's own account identifiers ride on the transmissions: idsite=theintercept.com and apikey=theintercept.com on the Parse.ly requests, and tid=G-94T13D50WM on the Google Analytics requests. The Parse.ly code Plaintiff's browser executed was a build published for Defendant's account, Defendant's own first-party code and tag-management container cause both Trackers to load on every page of the Website, and the Website's own _ti_user_properties_data cookie stores the Parse.ly visitor identifier that tracks each visitor across sessions.

## VII. <u>CLASS ALLEGATIONS</u>

68. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All persons within California who, during the class period, accessed www.theintercept.com from a browser that transmitted a request containing the URL or title of a Website page to p1.parsely.com, api.parsely.com, or www.google-analytics.com.

/ / /

69. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not millions, based on the reach and traffic of the Website. The Class is so numerous that joinder of all members is impracticable.

70. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual Class Members, including:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

71. TYPICALITY: As a person who visited the Website and whose browser transmitted the contents of his communications with the Website to the Trackers, Plaintiff is asserting claims typical of those of the Class Members. Plaintiff's claims arise from the same course of conduct that gives rise to the claims of the Class Members and

are based on the same legal theories.

72. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained competent and experienced counsel in complex class action litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

73. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable; many Class Members would not seek relief individually due to the relatively modest size of individual recoveries compared with the burden of individual litigation; and class treatment will allow uniform adjudication of common issues, conserve judicial resources, and provide consistent rulings.

## VIII. FIRST CAUSE OF ACTION

### Violation of California Invasion of Privacy Act (Cal. Penal Code § 631)

### By Plaintiff and the Class Members Against Defendant

74. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

75. Plaintiff brings this cause of action on behalf of himself and the Class.

76. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication, or in an unauthorized manner, reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable; or aiding, agreeing with, or conspiring with another to do the same.

77. The full URLs of Plaintiff's and Class Members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a) because they reveal the substance, purport, and meaning of what the user is reading on the Website, including, in this case, articles addressing the Israel-Palestine conflict, the conduct of the United States government in connection with that conflict, federal immigration enforcement, and federal law-enforcement conduct against political

protesters. The page titles transmitted in plain text to the Trackers likewise constitute "contents" because they communicate in human-readable terms the subject matter of each page the user accessed.

78. As alleged above, Parse.ly and Google each read, attempted to read, and learned the contents of Plaintiff's and Class Members' communications with the Website, willfully and without the consent of Plaintiff or Class Members, while those communications were in transit between Plaintiff's and Class Members' browsers and Defendant's servers, in violation of § 631(a).

79. Defendant willfully caused those interceptions and participated in them. Defendant intentionally configured the Website to transmit Plaintiff's and Class Members' URL contents and page-title contents to the Trackers while those communications were in transit, embedded and configured the Trackers under Defendant's own account identifiers, and caused them to execute in Plaintiff's and Class Members' browsers on every page load. By doing so, Defendant aided, agreed with, and conspired with Parse.ly and Google to accomplish the unlawful reading and interception of those communications, in violation of § 631(a).

80. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of statutory damages of $5,000 per violation or three times the amount of actual damages, pursuant to Cal. Penal Code § 637.2(a)(1), as well as injunctive relief and reasonable attorney's fees and costs.

## IX. SECOND CAUSE OF ACTION

### Violation of the Federal Wiretap Act (18 U.S.C. § 2511(1)(a))

### By Plaintiff and the Class Members Against Defendant

81. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

82. Plaintiff brings this cause of action on behalf of himself and the Class.

83. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. An "interception" for purposes of the

Federal Wiretap Act includes the acquisition of the contents of an electronic communication through the use of an electronic, mechanical, or other device while the communication is in transit.

84. The full URLs of Plaintiff's and Class Members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8) because they reveal the substance, purport, and meaning of those communications. The page titles transmitted to the Trackers in plain text likewise constitute contents.

85. Defendant intentionally configured the Website to transmit Plaintiff's and Class Members' URL contents and page-title contents to each Tracker, Parse.ly and Google, while those communications were in transit between Plaintiff's browser and Defendant's servers, thereby causing the interception of those communications by third parties.

86. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the unlawful interception, or statutory damages of $100 a day for each day of violation or $10,000, whichever is greater; punitive damages where appropriate; and reasonable attorney's fees and litigation costs.

## X. THIRD CAUSE OF ACTION

**Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.)**

**By Plaintiff and the Class Members Against Defendant**

87. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Plaintiff brings this cause of action on behalf of himself and the Class.

89. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct alleged herein constitutes unlawful and unfair business acts and practices within the meaning of § 17200.

90. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class Members' electronic communications with the Website without their consent, Defendant has violated CIPA, Cal. Penal Code § 631(a), and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Each of those statutory violations constitutes an independent predicate for liability under § 17200.

91. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class Members' URL contents and page-title contents to third parties for those third parties' commercial benefit, without disclosing the conduct, without obtaining consent, and without offering Plaintiff or Class Members any reasonable means of avoiding the interception. The harm to consumer privacy substantially outweighs any legitimate business justification.

92. Plaintiff and Class Members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data is a thing of value with established markets and exchange rates; Defendant and the third-party Trackers monetized Plaintiff's and Class Members' browsing data; and Plaintiff and Class Members were deprived of the value of that data without their consent and without compensation.

93. Plaintiff and Class Members provided their browsing data as implicit consideration for access to the Website, a data-for-services arrangement that Defendant exploited without disclosing the scope of the third-party interceptions.

94. Plaintiff and Class Members lack an adequate remedy at law with respect to Defendant's ongoing conduct. Damages are retrospective and cannot halt Defendant's continuing interception of the communications of Website visitors, which as alleged above is continuing through the present. Injunctive relief and restitution are accordingly necessary to remedy the ongoing violation.

95. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair conduct, restitution, and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members'

expense.

## XI. FOURTH CAUSE OF ACTION

**Violation of the California Constitution, Right to Privacy (Article I, Section 1)**

**By Plaintiff and the Class Members Against Defendant**

96. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

97. Plaintiff brings this cause of action on behalf of himself and the Class.

98. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. This constitutional right protects against unreasonable intrusions upon individuals' private affairs by both state and private actors.

99. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity and the page titles reflecting the subject matter of the content they viewed. California law recognizes a substantial privacy interest in personal information that may reveal sensitive matters of individual concern, including information bearing on a person's political beliefs, expressive associations, and views on matters of public concern.

100. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting an investigative-news publication does not expect that the specific URLs identifying the articles the user read, together with the plain-English page titles identifying their subject matter, would be silently transmitted to independent third-party analytics and advertising companies and joined to persistent cross-session user identifiers.

101. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring two third-party tracking mechanisms to intercept and transmit the contents of Plaintiff's and Class Members' electronic

communications, including communications addressing politically expressive subject matter such as the Israel-Palestine conflict and federal immigration and law-enforcement conduct, and by tying those communications to persistent cross-session user identifiers, Defendant has invaded interests protected by the California Constitution in a manner that an ordinary, reasonable person would regard as highly offensive.

102. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of control over the contents of their electronic communications and loss of the privacy protections to which they are entitled under California law. Plaintiff and the Class are entitled to nominal damages and injunctive relief.

## XII. FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

103. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

104. Plaintiff brings this cause of action on behalf of himself and the Class.

105. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a private place, conversation, or matter; and (2) an intrusion in a manner highly offensive to a reasonable person.

106. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding and configuring two third-party tracking mechanisms designed to capture the contents of those communications during the page-load process and transmit them to independent third parties for those third parties' commercial purposes.

107. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was reading and transmitted it to multiple third-party commercial entities for audience analytics and behavioral profiling, all without disclosing the scope of the third-party interceptions and

without obtaining consent.

108. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy in the contents of their electronic communications, loss of control over their personal information, and mental and emotional distress. Plaintiff and the Class are entitled to compensatory and nominal damages.

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against Defendant

109. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

110. Plaintiff brings this cause of action on behalf of himself and the Class.

111. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances making it inequitable for the defendant to retain the benefit without compensating the plaintiff.

112. Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for permitting such deployment, Defendant received analytics services, audience-identification services, and other valuable benefits from the operators of the Trackers, all of which were funded by the third-party operators' commercial exploitation of the intercepted contents of Plaintiff's and Class Members' communications with the Website.

113. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data has economic value, and Defendant's commercial monetization of that data through the Trackers deprived Plaintiff and Class Members of the value of their data without consent and without compensation.

114. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members. Defendant did not obtain consent before causing the interception of Plaintiff's and Class Members'

communications, and Defendant continued to monetize the intercepted data while concealing the scope of the third-party interceptions.

115. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV. PRAYER FOR RELIEF

116. WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law of intrusion upon seclusion and unjust enrichment;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the unlawful interception or $100 a day for each day of violation or $10,000, whichever is greater;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

117. Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 19, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*

Ross Cornell, Esq.
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*